1
2
3                    UNITED STATES DISTRICT COURT
4                         DISTRICT OF NEVADA
5                                * * *
6   UNITED STATES OF AMERICA,            Case No. 3:19-cr-00032-MMD-CLB-1
7                         Plaintiff,                  ORDER
8        v.
    JESSE PINA,
9
                          Defendant.
10
11   **I.    SUMMARY**

12          Defendant Jesse Pina was indicted on three counts for conspiracy to distribute

13   methamphetamine, possession with the intent to distribute methamphetamine, and

14   possession of a firearm in furtherance of a drug trafficking crime. (ECF No. 17.) Before

15   the Court is Defendant's motion for the Court to hold an evidentiary hearing regarding his

16   conditions of confinement ("Motion").[1] (ECF No. 66.) The Court also reviewed

17   Defendant's medical records from the Washoe County Detention Facility ("WCDF"),

18   where Defendant is being held as he awaits trial, which the government filed under seal

19   at the Court's request. (ECF Nos. 70 (Court's minute order), 71 (government's

20   supplement), 71-1 (sealed medical records).) Because Defendant has not shown that his

21   current conditions of confinement—notably, solitary confinement because he is a Norteno

22   gang member—constitute punishment, the evidence before the Court does not support

23   Defendant's counsel's claim that the conditions of his confinement render him unable to

24
25
26
27          [1]The government filed a response (ECF No. 68), and Defendant filed a reply (ECF
28   No. 69).

1  help prepare his own defense, and as further explained below, the Court will deny the

2  Motion.

3  **II.    BACKGROUND**

4  Defendant's initial appearance in this case occurred on July 5, 2019. (ECF No. 5.)

5  United States Magistrate Judge Carla L. Baldwin continued his detention hearing until

6  July 8, 2019 to allow time to see if there was space for him at the New Frontiers drug

7  treatment facility. (*Id.*) At his detention hearing, because a bed was available at New

8  Frontiers, Judge Baldwin ordered Defendant released on a personal recognizance bond,

9  but on the condition (among others) he remain at New Frontiers—and warned him she

10  would issue a warrant for his arrest if his time at New Frontiers was unsuccessful. (ECF

11  No. 11.) Judge Baldwin subsequently modified his conditions of confinement to no longer

12  include living at New Frontiers because he did not meet their inpatient treatment criteria.

13  (ECF No. 33.)

14  However, on November 7, 2019, Judge Baldwin ordered Defendant detained

15  pending trial because he had cut off his ankle bracelet and absconded from pretrial

16  supervision back in July 2019. (ECF Nos. 34, 35, 36, 44, 45, 64 at 16.) He has been held

17  at WCDF since then.

18  WCDF moved Defendant into segregation (commonly known as 'solitary

19  confinement') basically as soon as he arrived at WCDF because identified himself as a

20  Norteno gang member on a questionnaire he filled out at intake. (ECF No. 68-1 at 1; *see*

21  *also* ECF No. 68-2.) According to Deputy Rangle, WCDF had issues with Nortenos

22  engaging in gang activity in February 2019, noticed another flare-up of Norteno gang

23  activity in June 2019, and had then dealt with a Norteno hunger strike in October 2019.

24  (ECF No. 68-1 at 1-2.) WCDF therefore decided as a matter of institutional safety and

25  security to keep all Nortenos in segregation. (*Id.*)

26  Deputy Rangle interviewed Defendant on November 7, 2019, and explained to him

27  he would be held in segregation if he remained a Norteno. (*Id.* at 2.) Defendant told

28  2

Deputy Rangle that he was an active Norteno gang member, and thus wanted to be housed with other Nortenos. (*Id.*) Deputy Rangle told him that he would be housed in segregation because he was a Norteno, and this could mean he would remain in segregation for an extended period of time. (*Id.*) Deputy Rangle decided to keep Defendant in segregation so as not to jeopardize the safe and orderly functioning of WCDF. (*Id.*)

On January 27, 2020, WCDF Deputy Simcox filed a disciplinary report against Defendant because he was trying to lead a group workout of four other Nortenos. After Deputy Simcox told them they could only work out in pairs, Defendant took off his shirt to work out with the one other Norteno Deputy Simcox allowed him to work out with, which Deputy Simcox viewed as disregarding his authority, and an attempt to intimidate him and other deputies. (ECF No. 68-3 at 3-4.)

WCDF deputies reviewed Defendant's classification status with him on December 9, 2019, January 9, 2020, and February 9, 2020, and he reportedly told them he was doing fine, and would rather stay in segregation instead of ceasing to participate in Norteno gang activities. (ECF No. 68-4.)

On March 2, 2020, WCDF deputies determined that Defendant coordinated, led, and participated in a Norteno hunger strike, hoping to persuade WCDF officials to house all Nortenos together instead of in segregation. (ECF No. 68-5.)

On March 20, 2020, Defendant filed an emergency motion to reopen his detention hearing based on the threat posed by the novel coronavirus disease ("COVID-19") to incarcerated people generally.[2] (ECF No. 58.) Judge Baldwin denied his motion in a detailed order, primarily because he did not present any evidence to cause her to reconsider her findings in the confinement order that he had not abided by the terms of

---

[2]The government filed a response (ECF No. 62), and Defendant filed a reply (ECF No. 63).

pretrial release, and he was unlikely to abide by any conditions were she to impose them instead of having him detained, in part because of his active role in the Norteno gang. (ECF No. 64 at 16.) She also found his stated concerns about COVID-19 were insufficiently particularized to his individual circumstances and thus did not justify his release. (*Id.* at 17-20.) In addition, Judge Baldwin found that Defendant's proposed release plan—living with his mother in California—would not mitigate his stated COVID-19 concerns (*id.* at 20-22), and instead found his proposed plan would increase the risk that he could facilitate the spread of COVID-19 (*id.* at 22-23). Finally, Judge Baldwin rejected Defendant's argument that his release was necessary for the preparation of his defense. (*Id.* at 23-25.)

Defendant did not appeal Judge Baldwin's order. He instead filed the Motion on April 14, 2020. (ECF No. 66.) Meanwhile, according to the medical records the government filed with the Court under seal, Defendant requested and received a visit with a psychiatrist at WCDF in late 2019. (ECF No. 71-1 at 13-14 (sealed).) Moreover, a nurse has been checking on Defendant most days in segregation to monitor his mental state—the records run through April 24, 2020. (*Id.* at 57-111.) The nurse completed a form each time she completed one of these checks. (*Id.*) According to the forms, Defendant's behavior was always 'cooperative,' and the nurse never checked any of the boxes indicating acute mental health distress, or that Defendant required some sort of mental health intervention. (*Id.*) Moreover, other medical records indicate that a mental health nurse visited Defendant on April 15, 2020—one day after he filed the Motion. (*Id.* at 27.) According to the narrative she wrote about her visit, while Defendant said he was having trouble sleeping, he did not want any mental health drugs. (*Id.*) She noted that he did not mention, and she did not observe, any signs of acute mental health issues. (*Id.*)

## III. DISCUSSION

Though the Court's jurisdiction to consider Defendant's conditions of pretrial confinement in this case is limited, the parties—and the Court—agree that there are two

4

1   limited avenues through which the Court can consider Defendant's conditions of

2   confinement at WCDF. (ECF No. 68 at 2-3, 4-5.) The first is under *Bell v. Wolfish*, 441

3   U.S. 520, 535 (1979), and the second allows the Court to consider his conditions of

4   confinement only to the extent they affect his ability to aid his attorney in his defense, and

5   therefore obtaining a fair trial. (*Id.*) While the Court finds there is no basis at this time to

6   order a change in Defendant's conditions of confinement or hold an evidentiary hearing

7   on this issue, the Court addresses each of these two avenues, in turn, below. As to both

8   avenues, Defendant primarily challenges the fact that he is held in segregation at WCDF.[3]

9   (ECF No. 66 at 1-2 (arguing the mental distress caused by Defendant's solitary

10  confinement make "consultation regarding the substance of his criminal case virtually

11  impossible[,]" and stating these "conditions long predate COVID 19[.]").)

12      **A.    *Bell***

13      Where, as here, a defendant is detained before trial but following a judicial

14  determination of probable cause, the government "may detain him to ensure his presence

15  at trial and may subject him to the restrictions and conditions of the detention facility so

16  long as those conditions and restrictions do not amount to punishment, or otherwise

17  violate the Constitution." *Bell*, 441 U.S. at 536-37. "Not every disability imposed during

18  pretrial detention amounts to 'punishment' in the constitutional sense, however." *Id.* at

19  537.

20  ///

21

22

23      [3]The Court agrees with the government (ECF No. 68 at 6) that Defendant's
    discussion of the potential impact of COVID-19 on WCDF and thus his mental state in his
24  Motion (ECF No. 66 at 4-9) is inappropriate. Defendant did not appeal Judge Baldwin's
    order denying Defendant's emergency motion to reopen his detention hearing due to
25  COVID-19, where she specifically considered and rejected Defendant's argument that he
    should be released in light of COVID-19 in order to prepare an effective defense (ECF
26  No. 64 at 23-25). This order therefore focuses on Defendant's allegations regarding his
27  solitary confinement.

28                                                    5

When it comes to a restriction or disability the government imposes upon a particular pretrial detainee, the Court "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it." *Id.* (citations and internal punctuation omitted). Thus, arbitrary or purposeless restrictions may constitute punishment, but those reasonably related to a legitimate goal do not. *See id.* at 539. Keeping in mind that jail officials know best how to run jails (*see id.*):

> The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. . . . Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.

*Id.* at 540 (footnote omitted).

Here, Defendant raised *Bell* as justifying an evidentiary hearing on his conditions of confinement due to him being held in segregation. (ECF No. 66 at 1-2, 9.) The government counters that WCDF decided to house all Nortenos in segregation as a matter of institutional security, and Defendant is being held in segregation because he is an active Norteno who refuses to stop engaging in gang activities—and provided WCDF records that substantiate this explanation. (ECF No. 68 at 2-4.) The government thus responds that WCDF employees' decision to hold Defendant in segregation stems from their need to manage WCDF. (*Id.*) In reply, Defendant concedes he is a Norteno unwilling to cease gang activities, but explains how some of his particular socioeconomic circumstances led him to join a gang, and how it would be very difficult for him to 'deprogram,' or cease gang activities. (ECF No. 69 at 6-7.)

6

The Court does not question why Defendant became a Norteno, nor does it doubt it may be difficult for him to deprogram, but finds his explanation amounts to a concession that WCDF officials are holding him in segregation for a reason legitimately related to their need to manage WCDF while ensuring institutional security. The Court also notes it has seen no evidence, and Defendant has not argued, that anyone at WCDF has a expressed an intent to punish him. *See Bell*, 441 U.S. at 538. Therefore, holding Defendant in segregation at WCDF does not amount to "punishment" as that term is defined in *Bell*.

Indeed, the government proffered a memo from Deputy Rangle where he explained why WCDF holds Nortenos in segregation, and stated that he explained to Defendant that his decision to remain an active Norteno meant he would be held in segregation. (ECF No. 68-1.) Moreover, WCDF deputies discussed his classification with Defendant several times, and he chose to remain in segregation rather than deprogram as a Norteno. (ECF No. 68-4.) The government also proffered evidence to the effect that WCDF deputies think Defendant is a Norteno leader at WCDF. (ECF Nos. 68-3, 68-5.) In sum, the government has proffered evidence tending to show that Defendant is a Norteno, and it is holding him in segregation under a policy that is reasonably related to institutional security. Defendant not only fails to rebut this evidence here, but actually confirms it. The Court therefore declines to hold a hearing regarding Defendant's conditions of confinement under *Bell* because WCDF is not holding him in segregation merely to punish him.

## B.    Ability to Assist Counsel

Defendant also requests an evidentiary hearing regarding his conditions of confinement because they "are such that [Defendant] is experiencing such profound psychological distress, he is unable to meaningfully confer with counsel regarding anything other than expressing desperation regarding his conditions of confinement." (ECF No. 66 at 2.) The government concedes this can be a valid basis for seeking court

intervention, but argues the Court should not grant Defendant a hearing because he has not proffered any evidence of his mental health condition, he is able to communicate with his counsel despite being housed in segregation, and he has received mental health services at WCDF—and his mental health providers have not indicated he is in any sort of psychological distress. (ECF No. 68 at 4-5.) Defendant replies by again stating that his psychological state is adversely affecting his ability to assist in the preparation of his defense and offering a literature review of academic and popular writing to make the point that solitary confinement is so psychologically damaging it constitutes torture. (ECF No. 69 at 1-6.) The Court agrees with the government.

The Court does not disagree with Defendant that solitary confinement is psychologically damaging, but declines to grant him a hearing on his conditions of confinement at this time because the limited evidence before the Court does not support his counsel's claim he is in any acute psychological distress rendering him unable to assist in the preparation of his defense. To start, Defendant did not himself proffer any evidence to support his counsel's claims. (ECF Nos. 66, 69.) In contrast, the government proffered WCDF records in which Lieutenant Janet Bailey writes in an email that she had a mental health nurse at WCDF check on Defendant for mental health issues during his hunger strike,[4] and neither the nurse, or her supervising doctor, thought Defendant should be moved to the infirmary. (ECF No. 68-5 at 7.) This suggests they concluded Defendant was not in acute psychological distress. Thus, the limited evidence the parties presented to the Court does not weigh in favor of holding a hearing.

---

[4]Defendant mentions that he protested his conditions of confinement through a hunger strike (ECF No. 69 at 2), but declines to mention he was hunger striking in an attempt to convince WCDF officials to allow Nortenos to be housed together, rather than in segregation (ECF No. 68-5). As explained above, the Court found WCDF has a legitimate interest in housing Nortenos in segregation, and Defendant proffered no evidence to rebut that finding. Thus, the Court does not accord Defendant's hunger strike much weight as evidence Defendant is experiencing acute psychological distress.

Moreover, Defendant's medical records support the view that he is not in any acute psychological distress, and thus also weigh against holding a hearing here. Specifically, Defendant requested and received a visit with a psychiatrist at WCDF in late 2019. (ECF No. 71-1 at 13-14 (sealed).) And a nurse has been checking on Defendant most days in segregation to monitor his mental state—the records run through April 24, 2020. (*Id.* at 57-111.) The nurse completed a form each time she completed one of these checks. (*Id.*) According to the forms, Defendant's behavior was always 'cooperative,' and the nurse never checked any of the boxes indicating acute mental health distress, or that Defendant required some sort of mental health intervention. (*Id.*) Moreover, other medical records indicate that a mental health nurse visited Defendant on April 15, 2020—one day after he filed the Motion. (*Id.* at 27.) According to the narrative she wrote about her visit, while Defendant said he was having trouble sleeping, he did not want any mental health drugs. (*Id.*) She noted that he did not mention, and she did not observe, any signs of acute mental health issues. (*Id.*)

The evidence currently before the Court simply does not support his counsel's claim that Defendant is in such acute psychological distress he cannot meaningfully assist with the preparation of his defense. The Court therefore declines to hold a hearing on this issue at this time.

For these reasons, the Court will deny Defendant's Motion.

**IV.    CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the issues before the Court.

///

///

///

9

1    It is therefore ordered that Defendant Jessie Pina's motion for the district court to

2    hold an evidentiary hearing regarding his conditions of confinement (ECF No. 66) is

3    denied.

4        DATED THIS 1st day of May 2020.

5

6                                    _____

7                                    MIRANDA M. DU
                                     CHIEF UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28